# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

**ROCKDALE COUNTY,**

*Plaintiff,*

*v.*

**BIO-LAB INC.,** *et al.,*

*Defendants.*

C. A. No. 1:24-cv-04916-SEG

**JURY TRIAL**

---

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO
## DEFENDANTS' PARTIAL MOTION TO DISMISS
## OR IN THE ALTERNATIVE TO STRIKE

---

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ------------------------------------------------------------------------ii

FACTUAL SUMMARY --------------------------------------------------------------------------1

ARGUMENT -----------------------------------------------------------------------------------4

    I.  THE COUNTY'S CLEAN AIR ACT CLAIM SHOULD BE DISMISSED
       WITHOUT PREJUDICE, WITH LEAVE TO REFILE AFTER NOTICE ------5

    II. GEORGIA COMMON LAW DOES NOT BAR THE COUNTY FROM
       BEING REIMBURSED FOR ITS OUT-OF-POCKET EXPENSES, NOR
       FROM PURSUING RELIEF FOR ECONOMIC DAMAGES -------------------6

        A. The Free Public Services Doctrine, At Most, Bars Municipalities
           From Obtaining Reimbursement for the Expense of Responding to a
           Tortious Event; It Does Not Bar Seeking Other Damages--------------7

        B. This Case Should Proceed on the Premise That the Common Law of
           Georgia, in Line With the Clear Weight of Decisions in Other
           Jurisdictions, Recognizes That Nuisance Cases Are an Exception to
           the Free Public Services Doctrine --------------------------------------- 10

CONCLUSION --------------------------------------------------------------------------------- 19

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

*Bravo v. United States*,
 577 F.3d 1324 (11th Cir. 2009) .............................................................. 11

*Burch v. Cracker Barrel Old Country Store, Inc.*,
 2024 WL 4351647 (M.D. Ga. Sept. 30, 2024) ....................................... 18

*Canyon County v. Syngenta Seeds, Inc.*,
 519 F.3d 969 (9th Cir. 2008) .................................................................. 15

*Cherokee Nation v. McKesson Corp.*,
 529 F. Supp. 3d 1225 (E.D. Okla. 2021) ............................................... 17

*Cincinnati v. Beretta*,
 768 N.E.2d 1136 (Ohio 2002) ................................................................ 14

*City of Boston v. Purdue Pharma, L.P.*,
 2020 WL 416406 (Mass. Super. Ct. 2020) ............................................ 16

*City of Boston v. Smith & Wesson Corp.*,
 2000 WL 1473568 (Mass. Super. 2000) ................................................ 14

*City of Chicago v. Beretta U.S.A. Corp.*,
 821 N.E.2d 1099 (Ill. 2004) ................................................................... 15

*City of Flagstaff v. Atchison, Topeka & Santa Fe R. Co.*,
 719 F.2d 322 (9th Cir. 1983) ........................................................... passim

*City of Philadelphia v. Beretta U.S.A. Corp.*,
 277 F.3d 415 (3d Cir. 2002) ................................................................... 14

*CSX Transportation, Inc. v. General Mills, Inc.*,
 82 F.4th 1315 (11th Cir. 2023) .............................................................. 11

*Domingue v. Ford Motor Company*,
 2023 WL 2392039 (M.D. Ga. 2023) ...................................................... 18

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*,

    497 F. Supp. 3d 552 (N.D. Cal. 2020) ................................................................ 17

*In re Opioid Litigation*,

    2018 WL 3115102 (N.Y. Sup. Ct. Suffolk Cnty. 2018) ..................................... 16

*James v. Arms Technology, Inc.*,

    359 N.J. Super. 291 (App. Div. 2003) ................................................................ 15

*King v. King*,

    69 F.4th 738 (11th Cir. 2023) .............................................................................. 18

*Koch v. Consol. Edison Co. of N.Y., Inc.*,

    62 N.Y.2d 548 (1984) ........................................................................................ 8, 9

*National Casualty Company v. Georgia School Board Assoc. - Risk Management Fund*,

    2023 WL 5977299 (11th Cir. Sept. 14, 2023) .................................................... 18

*SE Property Holdings, LLC v. Welch*,

    65 F.4th 1335 (11th Cir. 2023) ........................................................................... 11

*Southern States Chemical, Inc. v. Tampa Tank & Welding, Inc.*,

    888 S.E.2d 553 (Ga. 2023) ................................................................................. 12

*Turner v. Wells*,

    879 F.3d 1254 (11th Cir. 2018) .......................................................................... 11

*Walker County v. Tri-State Crematory*,

    284 Ga. App. 34 (2007) ...............................................................................passim

## Statutes and Other Authority

42 U.S.C. § 7604(b)(1)(a) ................................................................................ 5

David C. McIntyre, *Tortfeasor Liability for Disaster Response Costs: Accounting*

    *for the True Costs of Accidents*, 55 Fordham L. Rev. 1001 (1987)..................... 13

Ga. Sup. Ct. R. 46 .......................................................................................... 18

Timothy D. Lytton, *Should Government Be Allowed to Recovery the Costs of*

    *Public Services from Tortfeasors?: Tort Subsidies, the Limits of Loss Spreading,*

    *and the Free Public Services Doctrine*, 76 Tulane L. Rev. 727 (2002) ............... 12

Plaintiff Rockdale County ("the County") files this response to the motion of Defendants Bio-Lab, Inc., and its corporate affiliates, KIK International LLC, and KIK Custom Products Inc. (collectively, "Bio-Lab"), to dismiss Count I of the County's First Amended Complaint, and to either dismiss or strike the County's claim for a subset of damages.

## FACTUAL SUMMARY

This case arises from a four-alarm fire that occurred on September 29, 2024, which started on the roof of Bio-Lab's facility, located at 1700 Covington Highway in Conyers, Rockdale County, Georgia. The fire led to the release of hazardous chemicals, including chlorine, chloramine, and bromine, resulting in a significant smoke plume that contaminated the air and atmosphere, posing serious health risks to the surrounding community. The incident prompted immediate emergency responses from County authorities, who issued shelter-in-place orders and established evacuation zones affecting over seventeen-thousand (17,000) residents. *See* First Am. Compl. ¶¶ 1, 3; *see also id.* at ¶¶ 17-18.

This environmental disaster was entirely preventable. It resulted from Bio-Lab's blatant disregard for standard industry safety protocols, including the inadequate provision for, and maintenance of, fire sprinklers and fire-control systems; inadequate maintenance of other safety equipment; and insufficient employee training on emergency response. The fire was worsened by Bio-Lab's

failure to properly secure and manage hazardous materials stored on-site. These safety failures directly contributed to the intensity of the fire and the subsequent release of harmful chemicals into the atmosphere, and the threat to the public was further exacerbated by Bio-Lab's failure to promptly and adequately apprise state and local officials regarding the release of harmful chemicals. *Id.* ¶ 2.

This was hardly an isolated incident. It was predated by Bio-Lab's long history of negligence and disregard for safety protocols, as demonstrated by the facility's history of compliance violations and previous incidents involving chemical spills and fires. Prior incidents at the Bio-Lab plant include a significant fire in 2004 that prompted mass evacuations due to the release of over 12.5 million pounds of chemicals, and a chlorine vapor cloud that resulted in the closure of Interstate Highway 20 in September 2020. These incidents, coupled with the ongoing investigations by the U.S. Environmental Protection Agency ("EPA") and the U.S. Chemical Safety and Hazard Investigation Board ("CSB"), reflect Bio-Lab's failure to maintain safe operating conditions and adequately protect the surrounding community from the inherent dangers associated with its operations. *Id.* ¶ 4.

The remedies sought by the County through this litigation are both retrospective and future oriented. Beyond the fines applicable under federal environmental statutes, *id.* ¶¶ 35, 43, and add-on matters such as punitive

damages, *id*. ¶ 81, and attorneys' fees, *id*. ¶ 88, under Georgia tort law the County seeks remedies which, for clarity, this response will list in three discrete categories:

**Remedy Category 1: Out-of-Pocket Expenses.** As to purely retrospective damages, the County seeks reimbursement of its extraordinary out-of-pocket expenses in reacting to this environmental disaster, including but not limited to expenses involved in the deployment of emergency officials, the cost of public notifications and evacuation procedures, the cost of cleaning debris resulting from the incident, and the cost of monitoring efforts (including testing of the air and water quality). *Id*. ¶¶ 5, 27, 29, 56-58.

**Remedy Category 2: Other Economic Damages.** Damages other than out-of-pocket expenses, both incurred in the past and likely to continue into the future, for which redress is also sought, include economic losses due to business interruptions, decreased property values, and the long-term impact on community health and safety, which collectively represent a substantial financial burden, and directly flow from Bio-Lab's actions, which have created a nuisance that will continue to damage the County until it is satisfactorily abated. *Id*. ¶¶ 58-59, 63-65.

**Remedy Category 3: Injunctive Relief.** As entirely prospective relief the County seeks, as a further remedy for the nuisance created by Bio-Lab, an injunction ordering Bio-Lab to remove from the environment the toxic substances

released from its facility, to fund the necessary measures to prevent further contamination, and/or to close the facility. *Id*. ¶¶ 68, 84-85.

## ARGUMENT

**Part I** of this response addresses Bio-Lab's argument that the County's claim arising under the Clean Air Act should be dismissed for failure to provide a 60-day notice. Bio-Lab's analysis of the statutory notice requirements is correct, and thus the Court should dismiss this claim, without prejudice, so that the County can amend its pleading to add back the claim, after the running of the required 60-day notice (which has already been given all relevant parties).

**Part II** addresses Bio-Lab's request for a ruling that would bar the County from seeking the damages sought in Remedy Categories 1 & 2, on the theory that the common law of Georgia incorporates a version of the free public services doctrine (also known as the municipal cost recovery doctrine) so draconian that it applies even when a municipality is suing on account of extraordinary expenses incurred due to a long-running and persistent nuisance.

In **Part II-A**, we first note that Bio-Lab has offered no authority for relying on this doctrine to exclude Remedy Category 2 from this litigation. The sole case cited by Bio-Lab (from New York) to suggest that the County may not seek damages for economic damages beyond out-of-pocket emergency response costs does not so hold.

In **Part II-B**, we address Bio-Lab's only support for denying the County reimbursement for the extraordinary out-of-pocket costs it incurred in responding to this environmental disaster: an 18-year-old Georgia intermediate appellate court decision. That decision is not controlling. The task before this Court is to predict how the Georgia Supreme Court would likely rule on this issue. We submit that it would likely adopt the overwhelming majority view that has developed in other jurisdictions, holding that nuisance lawsuits are exempted from this doctrine. This claim should therefore remain in the case. If Bio-Lab disagrees with that result, it is of course free to seek to have the issue certified to the Georgia Supreme Court, either at this juncture, or after a trial verdict.

## I.    THE COUNTY'S CLEAN AIR ACT CLAIM SHOULD BE DISMISSED WITHOUT PREJUDICE, WITH LEAVE TO REFILE AFTER NOTICE

Bio-Lab's first argument is that Count I of the County's First Amended Complaint, asserting a claim under the citizen suit provision of the Clean Air Act, must be dismissed due to the absence of the 60-day notice (to the EPA, the State of Georgia, and the alleged violators) required under 42 U.S.C. § 7604(b)(1)(a). Bio-Lab Mem. (ECF No. 48-1) at 6-8.

Shortly after receiving Bio-Lab's filing, undersigned counsel examined the authorities therein cited and contacted Bio-Lab's counsel to indicate agreement on this point (which could have been resolved through a stipulation, had it been called to our attention prior to the motion being filed). Because the 60-day notice

is mandatory and jurisdictional, in order for the County to proceed on this claim it is necessary that this Court dismiss Count I (without prejudice), and for the County to add back the claim through an amended complaint filed after the running of the 60-day notice (the County transmitted all required notices on March 14, 2025).

Accordingly, the County respectfully requests that this Court dismiss Count I without prejudice, while granting leave to file a further amended complaint once the statutory required notice period has run.

## II.    GEORGIA COMMON LAW DOES NOT BAR THE COUNTY FROM BEING REIMBURSED FOR ITS OUT-OF-POCKET EXPENSES, NOR FROM PURSUING RELIEF FOR ECONOMIC DAMAGES

Bio-Lab's second argument is that under the free public services doctrine (also known as the municipal cost recovery doctrine), the County should not be permitted recover "damages associated with expenses it incurred following the fire at the Conyers facility," or any of its claimed "economic losses due to business interruptions, decreased property values, and the long-term impact on community health and safety, which collectively represent a substantial financial burden on the city . . . ." Bio-Lab Mem. at 9 (quoting First Am. Compl. ¶ 58). We take these points in reverse order. We show in **Part II-A** that neither the 2007 Georgia intermediate appellate court decision on which Bio-Lab principally relies, nor the New York decision it also cites, supports the view that this doctrine bars suit for

economic damages caused by an environmental disaster. We then show in **Part II-B** that there is no sound basis for concluding that this 18-year-old decision reflects current Georgia law, because there is ample reason to conclude that the Georgia Supreme Court would refuse to adopt the *Walker County* interpretation of this doctrine as so broad that it applies even when a municipality is suing on account of extraordinary expenses incurred due to a long-running and persistent nuisance.

### A.  The Free Public Services Doctrine, At Most, Bars Municipalities From Obtaining Reimbursement for the Expense of Responding to a Tortious Event; It Does Not Bar Seeking Other Damages

Bio-Lab's brief correctly summarizes the function of the free public services doctrine, as generally barring "government entities from recovering the costs of providing public services from alleged tortfeasors." Bio-Lab Mem. at 10. But the Georgia decision on which Bio-Lab principally relies, *Walker County v. Tri-State Crematory*, 284 Ga. App. 34 (2007), provides absolutely no support for its argument that the doctrine somehow bars government entities from suing for redress of *other* damages caused by the underlying tortious conduct that do not involve reimbursement for out-of-pocket expenses, which are alleged by the County in this case, in what we term "Remedy Category 2."

In contrast to this litigation, involving an environmental disaster which has had broad impact on the entire community, causing the widespread economic damage alleged by the County, above and beyond the out-of-pocket costs of

response, see p. 3, supra (citing First Am. Compl. ¶¶ 58-59, 63-65), the lawsuit brought by Walker County did not seek actual damages tied to any impact on the community as a whole; it *only* sought reimbursement for the County's costs of properly disposing of the human remains at issue (plus punitive damages and attorney's fees). *Walker County*, 284 Ga. App. at 34. The court in that case thus had no occasion to consider whether the doctrine could be used to bar recovery of damages beyond the costs of response.

Nor does Bio-Lab even cite the case for that proposition. Rather, Bio-Lab cites only a New York case, *Koch v. Consol. Edison Co. of N.Y., Inc*., 62 N.Y.2d 548 (1984), as supposedly holding that the free public services doctrine "extends to claims by government entities for lost tax revenue and decreased productivity similar to certain alleged economic losses Rockdale County seeks to recover here." Bio-Lab Mem. at 13 (citing *id*. at 562). To the contrary, the decision held that, in general, New York City *could* sue for a wide range of damages caused by the blackout, including "damages for physical injury to persons and property directly resulting from the service interruption, including damages resulting from looting and vandalism by rioters . . . ." *Id*. at 553. The court did rule for the utility "as to two other categories of damage," *id*. at 560, and this is the portion of the decision that is incorrectly cited by Bio-Lab.

The court first held that the City would "not be permitted to recover costs incurred for wages, salaries, overtime and other benefits of police, fire, sanitation and hospital personnel from whom services (in addition to those which would normally have been rendered) were required in consequence of the blackout," under "[t]he general rule is that public expenditures made in the performance of governmental functions are not recoverable." *Id*. (citations omitted).

The court's discussion of the *second* category of damages is the part inaccurately cited by Bio-Lab. Here, the court was not discussing the free public services doctrine. Rather, it denied a damages recovery due to its focus on the particulars of the City's effort to seek damages for certain economic losses indirectly caused by the blackout, based on the record of the case. It held that "[t]he tender of proof of damages in this category is speculative only," and it cited "strong considerations of public policy" as "militat[ing] against recognition of losses" as a result of inevitable "interruptions in utility services from time to time," so that the recovery of "[l]oss of revenues" as a consequence would not be allowed. *Id*. at 561-62.

Bio-Lab offers no basis for invoking the free public services doctrine to bar the County from seeking the damages in Remedy Category 2. Only Remedy Category 1 could potentially be impacted by this doctrine.

**B.** **This Case Should Proceed on the Premise That the Common Law of Georgia, in Line With the Clear Weight of Decisions in Other Jurisdictions, Recognizes That Nuisance Cases Are an Exception to the Free Public Services Doctrine**

Bio-Lab's entire argument that the County is barred from seeking reimbursement for what we term the "Remedy Category 1" damages is based on the premise that the *Walker County* decision, by an intermediate appellate court, decided 18 years ago, is the definitive word on the current content of the common law of Georgia. Bio-Lab Mem. at 9 ("Georgia law bars Rockdale County's recovery of such expenses under the free public services doctrine.") (citing *Walker County*, 284 Ga. App. at 37). That decision articulated an extreme version of the doctrine, rejecting the exception for nuisance claims that had been recognized in the seminal decision by Justice (then-Judge) Kennedy in *City of Flagstaff v. Atchison, Topeka & Santa Fe R. Co.*, 719 F.2d 322, 324 (9th Cir. 1983). See *Walker County*, 284 Ga. App. at 38 n.3.

But a lone intermediate appellate decision, especially one nearly two decades old, is of course not decisive as to the content of the common law of Georgia as it exists today.  Where, as here, there is no holding of the Georgia Supreme Court declining to recognize an exception for nuisance claims, this Court's obligation is to predict, as best it can from available information, how the Georgia Supreme Court *would* rule if presented with this question — and it should disregard an intermediate appellate holding if there are persuasive indications

that the Georgia Supreme Court would rule otherwise. *See, e.g., CSX Transportation, Inc. v. General Mills, Inc.*, 82 F.4th 1315, 1326 n.6 (11th Cir. 2023). "Decisions of the intermediate appellate courts . . . provide guidance for this prediction," but a court "may disregard these decisions if persuasive evidence demonstrates that the highest court would conclude otherwise." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citations omitted).  *See also SE Property Holdings, LLC v. Welch*, 65 F.4th 1335, 1342 (11th Cir. 2023); *Bravo v. United States*, 577 F.3d 1324, 1325-26 (11th Cir. 2009) (summarizing Supreme Court decisions on this point).

This Court should disregard the 18-year-old *Walker County* decision because there are, indeed, persuasive indications that the Georgia Supreme Court would decline to adopt *Walker County*'s refusal to recognize an exception to the free public services doctrine in a case such as this one, which involves defendants who are alleged to have engaged in a continuous course of conduct, extremely damaging to the community, constituting a nuisance that has imposed on the municipality extraordinary expenses far beyond the usual provision of public services to residents.[1]

---

[1] The following discussion proceeds from a starting assumption that the Georgia Supreme Court would make an initial decision to follow the minority of jurisdictions that have adopted the free public services doctrine in *some* form, even though this doctrine has relatively shaky common-law roots, and has emerged relatively recently. *See* Timothy D. Lytton, *Should Government Be Allowed to Recovery the Costs of Public Services from*

It is clear that the Georgia Supreme Court, in articulating the common law of Georgia on a matter it has not previously addressed, accords significant weight to the rule followed in a majority of jurisdictions, and does not hesitate to overrule intermediate appellate court decisions that conflict with the majority rule. Recently, for example, in *Southern States Chemical, Inc. v. Tampa Tank & Welding, Inc.*, 888 S.E.2d 553 (Ga. 2023), the Court was faced with an issue of first impression: "whether a statute of repose is substantive or procedural in nature." *Id.* at 562. Emphasizing that it found "it instructive that the majority of other state courts that have considered the issue have concluded that repose statutes are substantive for retroactivity purposes," the Court announced it had decided to "join the majority of jurisdictions" on this issue, and then stated: "In so holding, we overrule any contrary decisions of the Court of Appeals . . . ." *Id.* at 563-64 (citations omitted).

It is reasonable to thereby infer that if the clear weight of authority in other jurisdictions recognizes an exception to the free public services doctrine for

---

*Tortfeasors?: Tort Subsidies, the Limits of Loss Spreading, and the Free Public Services Doctrine*, 76 Tulane L. Rev. 727, 731-41 (2002). It is entirely plausible, given the doctrinal weaknesses inherent in the doctrine, *see id.* at 752-59, and the various policy considerations counselling against the doctrine, *see id.* at 759-68, that, especially given how active the Georgia legislature has been in reforming tort law, the Georgia Supreme Court would decline to adopt this doctrine in *any* form, leaving it to the legislature to decide whether to shield tortfeasors from some damage claims brought by municipalities and, if so, to how broad such immunity should be.

nuisance cases, the Georgia Supreme Court would similarly overrule the contrary decision in *Walker County*, as a too-broad application of the free public services doctrine.

In fact, the clear weight of authority in other jurisdictions is plainly inconsistent with *Walker County*.

A review of other jurisdictions must begin with the seminal decision of Justice Kennedy in *Flagstaff*. It noted, albeit in dictum, four cases in which recovery had "been allowed where the acts of a private party create a public nuisance which the government seeks to abate." 719 F.2d at 324. *Walker County* sought to depict this exception as narrowly limited to "the unique context of the federal common law of nuisance regarding interstate waterways" or "a state statute authorizing recovery of the damages at issue." 284 Ga. App. at 39 n.3. But numerous courts have relied on *Flagstaff* in recognizing a nuisance exception that applies much more broadly.[2]

---

[2] Indeed, this development was presaged in a law review article published in the same year the *Walker County* decision was handed down, thereby contemporaneously documenting its outlier nature in minimizing the nuisance exception to the doctrine. *See* Note, David C. McIntyre, *Tortfeasor Liability for Disaster Response Costs: Accounting for the True Costs of Accidents*, 55 Fordham L. Rev. 1001, 1022-24 & n.129 (1987) (observing that "[c]ourts recognize that the government can recover response costs incurred during the abatement of a public nuisance," and correctly predicting that this trend created "room for expansion of liability for public nuisance abatement to encompass a greater number and type of disaster situations than previously recognized.") (citations omitted).

In 2000, a Massachusetts court relied on the nuisance exception noted in *Flagstaff* to hold that where plaintiffs "allege wrongful acts which are neither discrete nor of the sort a municipality can reasonably expect" (there, that gun manufacturers "maintained and exploited an illegal firearms market, knowing that the market would and did cause Plaintiffs harm"), the free public services doctrine would not prevent recovery of expenses. C*ity of Boston v. Smith & Wesson Corp.*, 2000 WL 1473568, *8 (Mass. Super. 2000).

In 2002, in *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415 (3d Cir. 2002), the Third Circuit relied on *Flagstaff* in noting the existence of "some authority for the proposition that public entities may recover damages for the costs of abating public nuisances." *Id*. at 420 n.4.

Similarly, in 2002, the Ohio Supreme Court, in *Cincinnati v. Beretta*, 768 N.E.2d 1136 (Ohio 2002), citing *Flagstaff's* nuisance exception, held that "[a]lthough a municipality cannot reasonably expect to recover the costs of city services whenever a tortfeasor causes harm to the public, it should be allowed to argue that it may recover such damages" in a case in which "the misconduct alleged" is "ongoing and persistent." *Id*. at 1149-50.

In New Jersey in 2003, an appellate court observed in *James v. Arms Technology, Inc.*, 359 N.J. Super. 291 (App. Div. 2003), that the free public services doctrine "does not apply to cases . . . where a municipality seeks to recover

14

damages for the cost of abating a nuisance." *Id.* at 327. That case was brought by municipalities that sued gun manufacturers, alleging that their distribution practices had created an illegal secondary market in firearms that constituted a public nuisance, imposing ongoing law enforcement costs on the municipalities. The court recognized an exception for costs incurred as a part of the abatement of a public nuisance, especially a nuisance involving a "repeated course of conduct" causing continuous harm. *Id.*

In Illinois in 2004, the Illinois Supreme Court cited *Flagstaff's* recognition of a nuisance exception, with approval. *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004). While noting that the nuisance exception could not justify reimbursement of the expenses involved in that case, for the "normal provision of police, fire, and emergency services," *id.* at 1145, the court noted that a nuisance exception had been recognized in cases involving "various forms of environmental pollution, for which the costs of abatement are recoverable . . . ." *Id.*

In 2008, the Ninth Circuit reaffirmed the decision in *Flagstaff*, as recognizing an "exception for suits to abate a public nuisance . . . ." *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 974 (9th Cir. 2008).

Much more recently, in 2018, a New York court, in litigation brought by New York counties against opioid manufacturers and distributors, seeking to

recover expenses incurred in responding to the opioid epidemic, rejected the defendants' argument that the municipal cost recovery rule barred the counties' claims, noting that the doctrine "does not bar a cause of action for public nuisance." *In re Opioid Litigation*, 2018 WL 3115102, *12 (N.Y. Sup. Ct. Suffolk Cnty. 2018).

In 2020, a Massachusetts court, in *City of Boston v. Purdue Pharma, L.P.*, 2020 WL 416406 (Mass. Super. Ct. 2020), in which a municipality also sought reimbursement of municipal expenses caused by the opioid crisis, relied on the nuisance exception recognized in *Flagstaff* to permit recovery of these damages, noting: "This conclusion is consistent with the decisions reached by many other courts that have examined this rule in the contexts of the nationwide opioid crisis." *Id.* at *11 (citation omitted).

Relying on *Flagstaff* and numerous decisions handed down in nuisance litigation against opioid and gun manufacturers, in 2020 a California federal court overseeing litigation against the manufacturers of nicotine vaping devices distilled from these decisions the principle that the nuisance exception to the free public services doctrine applies "where private individuals' intentional misconduct created the sort of ongoing and persistent man-made crisis that could not have been reasonably anticipated." *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 644 (N.D. Cal. 2020).

Finally, in 2021, in another opioids case, an Oklahoma federal district court, citing *Flagstaff*, reiterated that "abatement of a public nuisance is a legitimate basis for recovery related to the performance of public services," and that numerous courts had "rejected application of this doctrine where the harms arise from allegedly continuous, persistent, and ongoing wrongful conduct—as opposed to discrete instances of tortious behavior causing discrete expenditures of government resources." *Cherokee Nation v. McKesson Corp.*, 529 F. Supp. 3d 1225, 1234 (E.D. Okla. 2021).

None of these decisions—reflecting the overwhelming majority of jurisdictions that have recognized that the nuisance exception articulated in *Flagstaff* applies broadly to circumstances where, as here, defendants are alleged to have engaged in wrongful actions over a long period of time, posing a constant and continuing threat to a community, and imposing extraordinary, unexpected costs on the municipality—have been addressed by Bio-Lab in its brief. These decisions, and the fact that the Georgia Supreme Court takes due regard of the majority rule in other jurisdictions on matters of first impression, provide persuasive indications that if faced with the matter, the Georgia Supreme Court would likely adopt this consensus view, reached nationwide in recent years, and would not adopt the 18-year-old *Walker County* ruling that rejected the nuisance

exception to the free public services doctrine recognized by Justice Kennedy in *Flagstaff.*

It follows that this Court should reject Bio-Lab's request to bar the County from seeking reimbursement of its costs of response on its nuisance claim. We are aware of no basis for predicting that the Georgia Supreme Court would endorse the sweeping holding in *Walker County*, but we note that if Bio-Lab were able to make a plausible case to that effect, it could seek to bring the matter to a head by asking a court (either this Court, or the Eleventh Circuit on appeal), to certify the issue for consideration by the Georgia Supreme Court, pursuant to Georgia Supreme Court Rule 46, as is done on occasion where a court has difficulty predicting how the Georgia Supreme Court would rule. *See generally Burch v. Cracker Barrel Old Country Store, Inc.*, 2024 WL 4351647, *4 (M.D. Ga. Sept. 30, 2024) (summarizing Eleventh Circuit precedent governing certification). *E.g., National Casualty Company v. Georgia School Board Assoc. - Risk Management Fund*, 2023 WL 5977299, *2 (11th Cir. Sept. 14, 2023); *King v. King*, 69 F.4th 738, 740 (11th Cir. 2023); *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1270 (11th Cir. 2020); *Domingue v. Ford Motor Company*, 2023 WL 2392039, *2 (M.D. Ga. 2023).

## <u>CONCLUSION</u>

For all the reasons stated, this Court should dismiss Count I of the First Amendment Complaint, without prejudice (with leave to amend to reinstate the count, after the 60-day mandatory notice period has run), and should deny the remainder of Bio-Lab's motion.

Dated: March 24, 2025                    Respectfully submitted,

                                        */s/ Mirza Qader Ali Baig*
                                        Mirza Qader Ali Baig (GA # 031610)
                                        **M. QADER A. BAIG & ASSOCIATES, LLC**
                                        913 Commercial Street NE
                                        Suite B
                                        Conyers GA  30012-4537
                                        Tel. (770) 929-1665
                                        mqab@mqablaw.com

                                        */s/ Shayna E. Sacks*
                                        Shayna E. Sacks
                                              *(Admitted Pro Hac Vice)*
                                        **NAPOLI SHKOLNIK PLLC**
                                        360 Lexington Avenue
                                        Floor 11
                                        New York NY  10017-6502
                                        Tel. (212) 397-1000
                                        ssacks@napolilaw.com

                                        Hunter J. Shkolnik
                                              *(Admitted Pro Hac Vice)*
                                        Paul J. Napoli
                                              *(Admitted Pro Hac Vice)*
                                        Veronica N. Vazquez Santiago
                                              *(Admitted Pro Hac Vice)*
                                        **NS PR LAW SERVICES LLC**
                                        1302 Avenida Ponce de León
                                        San Juan PR  00907-3982
                                        Tel. (833) 271-4502
                                        hunter@nsprlaw.com
                                        pnapoli@nsprlaw.com
                                        vvazquez@nsprlaw.com

                                        ***Counsel for Plaintiff***

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1</u>

The undersigned hereby certifies that the foregoing document has been prepared in accordance with the font type and margin requirements of Local Rule 5.1 of the Northern District of Georgia, allowing the font type of Book Antiqua and point size of 13.

<u>*/s/ Shayna E. Sacks*</u>
Shayna E. Sacks

## **CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing document was served on all parties who have appeared in this case on March 24, 2025 via the Court's CM/ECF system.

*/s/ Shayna E. Sacks*
Shayna E. Sacks