UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROCKDALE COUNTY,

        Plaintiff,

    v.

BIO-LAB, INC.; KIK
INTERNATIONAL LLC; AND
KIK CUSTOM PRODUCTS, INC.,

        Defendants.

CIVIL ACTION NO.

1:24-CV-4916-SEG

## O R D E R

This matter is before the Court on Defendants Bio-Lab, Inc. ("Bio-Lab"),

KIK International LLC, and KIK Custom Products, Inc.'s (collectively, the "KIK

Defendants") partial motion to dismiss, or in the alternative, motion to strike.

(Doc. 48.)  After careful consideration, the Court enters the following order.

## I.    Background[1]

This case stems from a fire that engulfed a chemical plant owned by Bio-

Lab in Conyers, Georgia.  (Am. Compl., Doc. 9 ¶ 1.)  Bio-Lab is a company that

specializes in the manufacture of chemicals for swimming pools and spas.  (*Id.* ¶

---

[1] The following facts are derived from Plaintiff's amended complaint.  (Doc. 9.)
For purposes of resolving the pending motion to dismiss, the Court accepts the
well-pled allegations as true and construes them in the light most favorable to
Plaintiff. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012).

14.)  Bio-Lab owns a chemical manufacturing facility in Conyers, Georgia that produces chemicals used in pool and spa maintenance, including chlorine and other sanitizing agents.  (*Id.* ¶ 16.)  The KIK Defendants acquired Bio-Lab to grow their pool and spa treatment business in 2013.  (*Id.* ¶ 15.)

On September 29, 2024, a fire erupted at Bio-Lab's Conyers plant, located in Rockdale County (the "County").  (*Id.* ¶ 17.)  The fire triggered a chemical decomposition reaction that released chlorine gas and other hazardous chemicals stored at the facility into the atmosphere.  (*Id.* ¶¶ 1, 18.)  As a result, a large smoke plume containing harmful contaminants emerged from the fire, posing health risks to employees and nearby residents.  (*Id.*)  According to the County, the release of toxic chemicals caused severe air quality problems, including a substantial increase in chlorine and bromine particles in the surrounding area. (*Id.* ¶¶ 3, 25.)

In response to the fire, Rockdale County authorities mobilized firefighters to contain the blaze and prevent it from spreading to nearby structures.  (*Id.* ¶ 27.)  Moreover, because the smoke plume was spreading across the area, Rockdale County issued evacuation and shelter-in-place orders.  (*Id.* ¶ 21.)  The County ordered approximately 17,000 residents living in the area surrounding the plant to evacuate and 90,000 residents to shelter in place.  (*Id.*)  Public safety officials also disseminated information about potential health risks associated

with the smoke plume, advising residents on safety measures and evacuation procedures. (*Id.* ¶ 27.) In addition, the County closed its government offices and courthouse to minimize exposure to any hazardous emissions from the fire. (*Id.* ¶ 28.) At the time of filing this suit, the County alleged that it was continuing to engage in monitoring and cleanup efforts at the Bio-Lab plant to address contamination resulting from the incident. (*Id.* ¶ 29.)

On October 28, 2024, Rockdale County brought this suit against Bio-Lab and the KIK Defendants. (Doc. 1.) Shorly thereafter, the County filed an amended complaint which is the operative pleading in this case. (Doc. 9.) The County's amended complaint asserts ten counts: (1) Violation of the Clean Air Act ("CAA"), 42 U.S.C. § 7604(a); (2) Violation of the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11046(a); (3) Negligence; (4) Public Nuisance; (5) Private Nuisance; (6) Abatement of Nuisance; (7) Trespass; (8) Wantonness and Punitive Damages; (9) Injunctive Relief; and (10) Attorney's Fees and Expenses of the Litigation.[2] (*Id.* ¶¶ 34-88.) The County

---

[2] The County's "causes of action" for punitive damages, injunctive relief, and attorney's fees are not, in fact, standalone causes of action or claims, but rather requests for relief. *See, e.g.*, *Cohen v. Off. Depot, Inc.*, 184 F.3d 1292, 1297 (11th Cir. 1999), *opinion vacated in part on other grounds*, 204 F.3d 1069 (11th Cir. 2000) ("[A] request for punitive damages is not a 'claim' within the meaning of [Rule] 8(a)(2); it is only part of the relief prayed for in a claim."); *State Bank of Texas v. Patel*, No. 1:09-CV-1494-RLV, 2009 WL 10671850, at *4 (N.D. Ga. Dec.

alleges, *inter alia*, that Bio-Lab's failure to implement appropriate safety measures—including employee training, adequate fire sprinklers and fire control systems, and other safety equipment—directly contributed to the fire and subsequent release of hazardous chemicals. (*Id.* ¶¶ 2, 3, 19.) Among its requests for relief, the County seeks to recover the expense of providing emergency services in response to the Bio-Lab fire, as well as economic losses it suffered from the fire. (*Id.* ¶¶ 5, 56-58, 64, 70, 75.)

Defendants move to dismiss the County's CAA claim, and to dismiss or strike the County's request for damages incurred in its response to the incident. (Doc. 48.) The County opposes the motion. (Doc. 51.)

## II.    Legal Standards

### A. Motion to Dismiss for Failure to State a Claim

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a case when the complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When evaluating a Rule 12(b)(6) motion, the court must take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must

_____

22, 2009) ("[A] demand for attorney's fees is not an independent cause of action under Georgia law.").

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully," and when the "complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citing *Twombly*, 550 U.S. at 557). The complaint thus must contain more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action"—it must allege facts that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

## B. Motion to Strike

Federal Rule of Civil Procedure 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Rule 12(f) reflects the inherent power of the Court to prune down pleadings so as to expedite the administration of justice . . . ." *TracFone Wireless, Inc. v. Zip Wireless Prods., Inc.*, 716 F. Supp. 2d 1275, 1290 (N.D. Ga. 2010) (quoting *McNair v. Monsanto Co.*, 279 F. Supp. 2d

1290, 1298 (M.D. Ga. 2003)).  Motions to strike are disfavored and have been described by some courts as a "drastic remedy to be resorted to only when required for the purposes of justice." *Id.* (quoting *Stephens v. Trust for Pub. Land*, 479 F. Supp. 2d 1341, 1346 (N.D. Ga. 2007)).

## III.  Discussion

Defendants seek dismissal of Rockdale County's claim brought under the CAA for failure to comply with the statute's pre-suit notice requirement.  (Doc. 48-1 at 6-8.)  Further, Defendants move to dismiss, or in the alternative, strike Rockdale County's request for expenses incurred in providing public services in response to the fire.  (*Id.* at 9-17.)  The Court addresses each issue in turn.

### A. CAA Claim

Pursuant to the CAA's citizen-suit provision, "any person may commence a civil action . . . against any person . . . who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of . . . an emission standard or limitation . . . ."  42 U.S.C. § 7604(a)(1).  The provision contains a pre-suit notice requirement, which provides that "[n]o action may be commenced . . . prior to 60 days after the plaintiff has given notice of the violation (i) to the Administrator, (ii) to the State in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order[.]"  *Id.* § 7604(b)(1)(A).  Thus, "unless the plaintiff provides specific notice of intent to sue at least 60 days

6

before filing the complaint, a citizen suit may not be maintained." *Nat'l Parks & Conservation Ass'n, Inc. v. Tennessee Valley Auth.*, 502 F.3d 1316, 1328 (11th Cir. 2007).  The notice requirement is "strictly construed to give the alleged violator the opportunity to correct the problem before a lawsuit is filed." *Id.* at 1329.

Defendants contend that Rockdale County has failed to allege that it gave the pre-suit notice required to bring a CAA claim.  (Doc. 48-1 at 8.)  The County concedes that it did not comply with the CAA's notice requirement before filing this action.  (Doc. 51 at 10-11.)  To correct the issue, the County represents that it transmitted the notices required by the CAA on March 14, 2025, and requests that the Court dismiss its CAA claim without prejudice with leave to "add back the claim through *an amended complaint* filed after the running of the 60-day notice." (*Id.* at 11 (emphasis added).)

Defendants object to dismissal without prejudice of the County's CAA claim, contending that "courts routinely dismiss Clean Air Act claims with prejudice for failure to comply with the pre-suit notice requirement." (Doc. 60 at 2-3.)  In support of this argument, Defendants cite only two cases.  *See Nat'l Parks*, 502 F.3d at 1328-30; *Palm Beach Cnty. Env't Coal. v. Florida*, 651 F. Supp. 2d 1328, 1337, 1354-1355 (S.D. Fla. 2009).  While *Nat'l Parks* affirmed the dismissal of a CAA claim with prejudice, and *Palm Beach* dismissed a CAA claim

with prejudice, neither case analyzed whether dismissal without prejudice is appropriate for failure to comply with a pre-suit notice requirement.

To determine the correct procedure for dismissing the County's CAA claim, the Court looks to the Supreme Court's analysis of a nearly identical 60-day notice requirement in the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq.* *See Hallstrom v. Tillamook Cnty.*, 493 U.S. 20 (1989); *compare* 42 U.S.C. § 7604(b)(1)(A) (CAA 60-day pre-suit notice requirement) *with* 42 U.S.C. § 6972(b)(1)(A) (RCRA 60-day pre-suit notice requirement). Reading the statutory language that "[n]o action may be commenced . . . prior" to satisfaction of the 60-day notice requirement, the *Hallstrom* Court determined that providing adequate notice was a "a mandatory, not optional, condition precedent for suit." 493 U.S. at 26; *see id.* at 31 ("[W]e hold that the notice and 60-day delay requirements are mandatory conditions precedent to commencing suit under the RCRA citizen suit provision; a district court may not disregard these requirements at its discretion."). The Court explained, moreover, that "if an action is barred by the terms of a statute, it must be dismissed." *Id.* at 31. As such, "where a party suing under the citizen suit provisions of RCRA fails to meet the notice and 60-day delay requirements . . . , the district court must dismiss the action as barred by the terms of the statute." *Id.* at 33; *see also Nat'l Env't Found. v. ABC Rail Corp.*, 926 F.2d 1096, 1097-98 (11th Cir. 1991) ("If a plaintiff fails to

comply with this notice requirement where it is applicable, the district court is required to dismiss the action.").

Despite requiring dismissal of a prematurely filed RCRA action, however, the Supreme Court was careful to clarify that dismissal for failure to comply with the notice requirement would not deprive plaintiffs of their "right to a day in court." *Hallstrom*, 493 U.S. at 32 (quoting *Chevron Oil Co. v. Huson*, 404 U.S. 97, 108 (1971)). Rather, plaintiffs "remain free to give notice and file their suit in compliance with the statute to enforce pertinent environmental standards." *Id.* In other words, plaintiffs who fail to give proper notice may, following dismissal, file their RCRA claim in a *new suit* that complies with the mandatory notice requirement.

Although the Eleventh Circuit does not appear to have addressed whether dismissal without prejudice is appropriate for a failure to comply with the CAA's pre-suit notice provision, it has relied on *Hallstrom* in permitting a plaintiff to refile an action which was dismissed for failure to comply with the Oil Pollution Act's ("OPA") notice requirement. *See Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.*, 51 F.3d 235, 240 (11th Cir. 1995) ("Appellants remain free to refile this action, if and when they comply with OPA's claims presentation procedure." (citing *Hallstrom*, 493 U.S. at 31-33.)). In addition, at least one circuit has found that district courts should dismiss a claim *without prejudice* for failure to satisfy

a 60-day pre-suit notice requirement in the Clean Water Act ("CWA") that is materially identical to the one at issue here. *See Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 489 (2d Cir. 2001), *adhered to on reconsideration*, 451 F.3d 77 (2d Cir. 2006) (affirming a district court's determination that a plaintiff failed to comply with the CWA's pre-suit notice requirement but remanding with instructions to dismiss the claim without prejudice for refiling, instead of dismissal with prejudice).

This result also accords with the general rule governing the amendment of complaints—namely, that "where a more carefully drafted complaint might state a claim, a plaintiff must be given *at least one* chance to amend the complaint before the district court dismisses the action with prejudice." *Garcia v. Chiquita Brands Int'l, Inc.*, 48 F.4th 1202, 1220 (11th Cir. 2022) (quoting *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001)); *see also Pinnacle Adver. & Mktg. Grp. Inc. v. Pinnacle Adver. & Mktg. Grp., LLC*, 7 F.4th 989, 1000 (11th Cir. 2021) ("[D]istrict courts should generally exercise their discretion in favor of allowing amendments to reach the merits of a dispute.").

Therefore, consistent with *Hallstrom*, the Court will dismiss the County's CAA claim *without prejudice* to permit refiling in compliance with the CAA's 60-day pre-suit notice requirement. However, because satisfaction of the notice requirement is a condition precedent to *commencing suit*, *see* 42 U.S.C. §

7604(b)(1)(A) ("[n]o action may be commenced . . . prior" to the 60-day notice period running), the County cannot simply file an amended complaint in this action to maintain its CAA claim.  "[A]mending or supplementing a complaint does not *bring* a new action, it only *brings* a new complaint into an action that is already pending." *United States ex rel. Wood v. Allergan, Inc.*, 899 F.3d 163, 172 (2d Cir. 2018).  Rather, if the County wishes to maintain a CAA claim against Defendants, it may only do so by *filing a new action* which complies with the CAA's notice provision.[3]

### B. Damages Related to Emergency Response Costs

In its first amended complaint, the County seeks to recover certain "damages related to its responsibilities and response to the [Bio-Lab fire] emergency, which include but are not limited to the deployment of emergency officials, public notifications, and the cleaning of debris resulting from the incident."  (Am. Compl., Doc. 9 ¶ 5.)  It further seeks "expenses associated with emergency response efforts, evacuation procedures, and public health measures necessitated by the explosion at the Bio-Lab plant[,]"  (*Id.* ¶ 56); "costs related to

---

[3] Of course, the County may, if it so chooses, move to consolidate any new, related action with this one.  *See* Fed. R. Civ. P. 42(a)(2) ("If actions before the court involve a common question of law or fact, the court may . . . consolidate the actions[.]").  The Court does not prejudge the merits of any potential motion for consolidation.

the evacuation of approximately 17,000 residents and the shelter-in-place orders for the remaining 90,000 residents" (*Id.* ¶ 57); as well as "economic losses due to business interruptions, decreased property values, and the long-term impact on community health and safety, which collectively represent a substantial financial burden on the city." (*Id.* ¶ 58.)

Defendants contend that the County's recovery of these expenses is precluded by Georgia's "free public services doctrine." (Doc. 48-1 at 9-17.) The Georgia Court of Appeals has provided guidance regarding the application of the free public services doctrine. The principal case upon which Defendants rely, *Walker County v. Tri-State Crematory*, considered a public nuisance suit brought by a county seeking "expenses it incurred in recovering, identifying, and properly disposing of . . . human remains" that were improperly stored at a crematorium. 643 S.E.2d 324, 325 (Ga. Ct. App. 2007). In *Walker County*, the Court of Appeals "conclude[d] that Georgia, like many jurisdictions, has adopted the common-law free public services doctrine." *Id.* at 327 (footnote omitted). The *Walker County* Court described the doctrine as follows: "absent specific statutory authorization or damage to government-owned property, a county cannot recover the costs of carrying out public services from a tortfeasor whose conduct caused the need for the services." *Id.* (citing, *inter alia*, *Dist. of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1080 (D.C. Cir. 1984); *City of Flagstaff v. Atchison, Topeka & Santa*

*Fe R. Co.*, 719 F.2d 322, 323-324 (9th Cir. 1983)). The "primary rationale" underlying the doctrine is that "state legislatures establish local governments to provide core services for the public and pay for these services by spreading the costs to all citizens through taxation." *Id.* (quoting *Baker v. Smith & Wesson Corp.*, No. Civ. A. 99C–09–283–FS, 2002 WL 31741522, at *5 (Del. Super. Ct. Nov.27, 2002)). The Court of Appeals also noted its view that "any decision over whether to reallocate how those costs are spread necessarily implicates fiscal policy, a matter best left to 'the legislature and its public deliberative processes, rather than the court.'" *Id.* (quoting *Flagstaff*, 719 F.2d at 324).

Applying the free public services doctrine to the facts before it, the Court of Appeals determined that Walker County was "not seeking to recover costs associated with injury to its own property, but rather the costs it incurred in performing the public services of cleaning up the crematorium site and *providing disaster relief*." *Id.* (emphasis added). The *Walker County* Court also found that no statute specifically authorized recovery of "compensatory damages in a tort action alleging negligence or *public nuisance* claims." *Id.* at 327-28 (emphasis added). Accordingly, the Court concluded that Walker County's tort claims against the crematorium were barred by the public services doctrine.

Of particular importance here, the Court of Appeals expressly "reject[ed]" Walker County's argument that there should be an exception to the free public

services doctrine when the costs are incurred as part of the abatement of a public nuisance." *Id.* at 328. "If such an exception were recognized," the Court reasoned, "it would be the exception that swallows the rule, since many expenditures for public services could be re-characterized by skillful litigants as expenses incurred in abating a public nuisance." *Id.* In reaching this conclusion, the *Walker County* Court also noted that the Georgia General Assembly had already "created a statutory method for counties to obtain liens on private property on which public nuisances are found and abated." *Id.* at 328-29 (citing O.C.G.A. §§ 41-2-7(b); 41-2-9(a)(7), (b); 31-5-10(d)). Given the availability of a statutory remedy, the Court saw "no pressing need for carving out a special exception to the free public services doctrine for public nuisance cases[.]" *Id.* at 329.

The only other Georgia case that Defendants cite is *Torres v. Putnam Cnty.*, a Court of Appeals decision which preceded *Walker County*. 541 S.E.2d 133 (Ga. Ct. App. 2000). In *Torres*, Putnam County sued an owner of real property and several associates for violating zoning ordinances and building and safety codes. *Id.* at 134. As part of its suit, the County sought to recover the cost of sending a building inspector and the sheriff to the property. *Id.* at 136. The Court of Appeals, citing several cases from other jurisdictions applying the free public services doctrine, concluded that there was "no authority for the position that such an expenditure of public funds in performing a public duty required by law

implicates any private right." *Id.* In short, the *Torres* Court held, a county could not recover for the injury of "causing the county to spend money enforcing its laws and protecting its citizens." *Id.*

A plain reading of *Walker County* and *Torres* suggests that, in this case, Rockdale County is precluded from recovering certain expenses of its response to the Bio-Lab fire pursuant to the free public services doctrine. Rockdale County advances two arguments in opposition. First, the County contends that even if the free public services doctrine bars it from seeking the costs of its emergency response, the County can still seek other damages related to the impact on the County including economic losses. (Doc. 51 at 12-14.) The Court will address the issue of economic losses in the next section of this order. Second, the County argues that *Walker County* was wrongly decided and that the Court should decline to follow it. (*Id.* at 15-23.)

Specifically, the County contends that *Walker County* "articulated an extreme version of the [free public services] doctrine" by rejecting an exception for public nuisance claims that other courts have recognized. (*Id.* at 15.) It argues that the Court "should disregard the 18-year-old *Walker County* decision because there are . . . persuasive indications that the Georgia Supreme Court would decline to adopt *Walker County's* refusal to recognize an exception to the free public services doctrine in a case such as this one[.]" (*Id.* at 16.) For instance,

15

Rockdale County points to then-Judge Kennedy's influential opinion in *City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, which noted that recovery of government costs may be permissible "where the acts of a private party create a public nuisance which the government seeks to abate[.]" 719 F.2d 322, 324 (9th Cir. 1983). Several courts have relied on *Flagstaff* to suggest that municipalities may recover damages for the costs of abating public nuisances in certain circumstances. *See, e.g.*, *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 420 n.4 (3d Cir. 2002) ("There is . . . some authority for the proposition that public entities may recover damages for the costs of abating public nuisances."); *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1149 (Ohio 2002) ("Although a municipality cannot reasonably expect to recover the costs of city services whenever a tortfeasor causes harm to the public, it should be allowed to argue that it may recover such damages" in cases where the misconduct alleged "is ongoing and persistent."); *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 644 (N.D. Cal. 2020) (explaining that numerous courts have noted an exception to the "municipal cost recovery rule" in cases "where private individuals' intentional misconduct created the sort of ongoing and persistent man-made crisis that could not have been reasonably anticipated").

16

The Court is unpersuaded by the County's argument that it should disregard the holding of *Walker County*. The Eleventh Circuit has instructed that when "a state's highest appellate court (in this case the Georgia Supreme Court) has addressed an issue of state law, [courts must] simply apply its holding." *CSX Transportation, Inc. v. Gen. Mills, Inc.*, 82 F.4th 1315, 1326 n.6 (11th Cir. 2023). However, when a court is "confronted with a state-law issue of first impression, [it] must attempt to predict how the state's highest court would decide the issue." *Id.* "Absent certainty from the state's highest court," a district court must "apply the decisions of the state's intermediate court—here, the Georgia Court of Appeals—unless there is persuasive indication that the Georgia Supreme Court would rule otherwise." *Id.* (cleaned up); *see Chepstow Ltd. v. Hunt*, 381 F.3d 1077, 1080 (11th Cir. 2004).

Here, the Georgia Supreme Court has not issued an opinion discussing the free public services doctrine. As such, this Court must apply the decisions of the Georgia Court of Appeals—namely, *Walker County* and *Torres*—unless "persuasive indication[s]" suggest that the Georgia Supreme Court would decide the issue differently. *CSX Transportation*, 82 F.4th at 1326 n.6.

As an initial matter, the Court of Appeals' decision in *Walker County* was appealed, but the Georgia Supreme Court denied Walker County's application for certiorari. *See Walker County v. Tri-State Crematory*, No. S07C1025 (Ga. June

4, 2007).   While the denial of certiorari does not necessarily imply that the Georgia Supreme Court agreed with the Court of Appeals' opinion in *Walker County*, it is nevertheless notable that the Supreme Court chose to let the decision stand.

It is also worth noting, as *Walker County* highlighted, that the County appears to have a statutory remedy to abate a public nuisance caused by the Bio-Lab fire.  *See Walker Cnty.*, 643 S.E.2d at 329 ("The statutory framework set forth in Title 41 provides a means for counties to recoup the costs of abating a public nuisance, albeit indirectly, through obtaining a lien and instituting an enforcement proceeding.").   Indeed, the County's Amended Complaint brings an "Abatement of Nuisance" claim pursuant to O.C.G.A. §§ 41-2-1 and 41-2-2.   (Doc. 9 ¶¶ 66-68.)   The availability of a statutory remedy cuts against the County's prediction that the Georgia Supreme Court would overrule *Walker County*.  *See Walker Cnty.*, 643 S.E.2d at 329 ("Given this available statutory remedy, we see no pressing need for carving out a special exception to the free public services doctrine for public nuisance cases, and thereby potentially opening the litigation floodgates as a result of such an ambiguous exception.").

But even if the Court were to find that the Georgia Supreme Court *might* recognize a public nuisance exception to the free public services doctrine, as other jurisdictions have, it is unlikely that the emergency response costs sought in this

18

case would fall within that exception.  *Flagstaff*, which the County relies upon to support the public nuisance exception, explained that cases satisfying the exception "fall into distinct, well-defined categories *unrelated to the normal provision of police, fire, and emergency services*" in response to accidents like the train derailment at issue there.  719 F.2d at 324.  In addition, most of the out-of-state decisions that the County cites in support of the public nuisance exception distinguish "a single, discrete incident requiring a single emergency response," for which a municipality cannot recover the cost of public services, from "ongoing and persistent" misconduct causing a public nuisance, for which a county may recoup expenses.  *Cincinnati*, 768 N.E.2d at 1149; *see James v. Arms Tech., Inc.*, 820 A.2d 27, 48-49 (N.J. App. Div. 2003) (distinguishing "a single incident, resulting in a nominal expense to the municipality" with "a repeated course of conduct on defendants' part, requiring the City to expend substantial governmental funds on a continuous basis"); *In re JUUL Labs, Inc.,* 497 F. Supp. 3d at 644.

This case, however, involves a discrete environmental disaster much more akin to the train derailment that occurred in the *Flagstaff* case.  *See Flagstaff*, 719 F.2d at 323 (rejecting a county's claim for expenses for its evacuation of residents caused by the train derailment "including overtime pay, emergency equipment, emergency medical personnel, and the cost of food provided to

evacuated residents"). The Court acknowledges that there have been other incidents at Bio-Lab's Conyers plant over the past two decades, (*see* Doc. 9 ¶ 4), but based on the County's complaint, these do not appear to constitute an "ongoing and persistent" crisis like those analyzed by other courts. *See Cincinnati*, 768 N.E.2d at 1149 (seeking damages related to ongoing gun violence); *In re JUUL Labs, Inc.,* 497 F. Supp. 3d at 578, 644 (seeking costs "incurred when responding to the youth e-cigarette crisis"). The County may still seek remedies to abate a public nuisance caused by the fire—for instance, ongoing land or air pollution—pursuant to the statutory framework set forth in O.C.G.A. § 41-2-1, *et seq.*, but it does not follow that it can recover its emergency response costs. In the Court's view, the County has not shown persuasive evidence demonstrating that the Georgia Supreme Court would find that the County's emergency response costs for the Bio-Lab fire fall within a yet-unrecognized public nuisance exception to the free public services doctrine under Georgia law.

Accordingly, following the reasoning of *Walker County*, the Court concludes that the County may not seek damages for the cost of providing emergency services in response to the Bio-Lab fire. At this early motion-to-dismiss stage, where the full contours of the County's requests for relief are not yet fully defined, the Court will only dismiss damages requests that it considers clearly precluded by *Walker County*. The Court thus dismisses—with respect to the County's

claims for negligence (Count III), public nuisance (Count IV), private nuisance (Count V), abatement of nuisance (Count VI), and trespass (Count VII) only—the following damages requests to reimburse expenses for: (1) "the deployment of emergency officials" (Doc. 9 ¶ 5); (2) "public notifications" (*id.* ¶ 5); (3) "evacuation procedures" (*id.* ¶¶ 56, 70); and (4) "the evacuation of approximately 17,000 residents and the shelter-in-place orders for the remaining 90,000 residents" (*id.* ¶ 57).[4]  The Court's dismissal of these requests for relief should be narrowly construed and does not affect the damages the County may seek under federal law.  It also does not alter the County's ability to pursue injunctive relief or statutory remedies set forth in state law (such as remedies that may be available in O.C.G.A. § 41-2-1, *et seq.*).

### C. Economic Losses

Finally, the parties dispute whether the free public services doctrine prevents the County from recovering certain economic losses stemming from "business interruptions, decreased property values, and the long-term impact on community health and safety[.]"  (Doc. 9 ¶ 58.)  Neither party has cited any Georgia case that addresses the question.

_____

[4] At this stage, the Court declines to dismiss the County's request for damages related to the "cleaning of debris resulting from the incident[,]" (Doc. 9 ¶ 5), because the County *may* be able to recover such damages under theories of private nuisance or trespass to its own property.

Defendants' argument that the County should be precluded from recovering economic losses rests exclusively on *Koch v. Consol. Edison Co. of New York*, a prominent New York Court of Appeals decision sometimes featured in tort law casebooks.  62 N.Y.2d 548, 468 N.E.2d 1 (N.Y. 1984).[5]  *Koch* involved a suit brought by the City of New York and several public benefit corporations to recover damages from a citywide electrical blackout caused by the electrical utility Con Edison's negligence.  *Id.* at 553.  The *Koch* Court barred the plaintiffs from seeking damages related to economic losses caused by the blackout, including "taxes not recovered on sales, transfers, and business transactions not undertaken, transit fares and tolls not paid, and receipts from wagers not placed with the Off-Track Betting Corporation."  *Id.* at 561.  Specifically, the Court of Appeals found that "the tender of proof of damages in this category [was] speculative only, determinable solely by reference to collateral transactions (or their absence)[.]"  *Id.*  But aside from issues of proof, the Court of Appeals expounded:

> There are strong considerations of public policy which militate against recognition of losses sustained by municipal and public benefit corporations in consequence of adverse effects on the general economy. That there will inevitably be interruptions in utility services from time to time must be taken for granted. Loss of revenues by municipal and public benefit

---

[5] The New York Court of Appeals is New York's highest court. *Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*, 833 F.3d 1299, 1309 (11th Cir. 2016).

corporations in consequence of the interruption of utility services, however, is the economic counterpart of the incurment of added costs attributable to such interruption. In neither case will recovery be allowed.

*Id. at* 561-62 (cleaned up).

Defendants urge the Court to adopt *Koch's* reasoning to bar the County from seeking economic losses it may have sustained. (Doc. 48-1 at 13; Doc. 60 at 10-12.) The County, however, points out that nothing in *Walker County's* articulation of the free public services doctrine appears to implicate economic losses of the type sought by the County. (Doc. 51 at 12-13.) The County further argues that *Koch's* reasoning primarily rested on case-specific evidentiary concerns and highlights that the decision still permitted the City of New York to seek a range of damages including those caused by looting and vandalism by rioters that occurred during the blackout. (*Id.* at 13-14.)

Whatever persuasive force the *Koch* decision might have, at this early motion-to-dismiss stage, the Court declines to preclude the County from seeking economic losses stemming from the Bio-Lab fire. Given that the parties have not presented any Georgia decision that analyzes the free public services doctrine's application to economic losses, the Court's consideration of the issue would benefit from further evidentiary development and briefing on the approach adopted by other jurisdictions beyond New York. Indeed, the contours of the County's request for economic losses, which may aid resolution of this issue, are

not yet fully defined at this stage of the case.  As such, the Court will defer any decision regarding whether any category of economic losses might be barred by the free public services doctrine.  The parties are free to re-raise this issue on summary judgment.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss (Doc. 48) is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff's CAA claim (Count I) is **DISMISSED WITHOUT PREJUDICE**.  While Plaintiff may refile its CAA claim in a new action, it may not do so in this case.  The rest of Plaintiff's claims remain in the case.  In addition, the motion is granted, as stated herein, with respect to Plaintiff's requests for damages for the cost of providing emergency services in response to the September 2024 Bio-Lab fire, but the motion is denied as to Plaintiff's request for economic losses.[6]

Defendants' alternative motion to strike (Doc. 48) is **DEEMED MOOT.**

**SO ORDERED**, this 2nd day of September, 2025.

SARAH E. GERAGHTY
United States District Judge

---

[6] The dismissal of these requests for relief is limited to the County's claims for negligence (Count III), public nuisance (Count IV), private nuisance (Count V), abatement of nuisance (Count VI), and trespass (Count VII).